Good morning, all. Our first case this morning is Dayton v. Oakton Community College. Mr. Eisenberg. Good morning, Your Honors. May it please the Court. This case asks whether an employer's own negligent actions can establish a reasonable factor other than age as an affirmative defense of a disparate impact age discrimination case. In this case, a single human resource employee employed by Oakton Community College failed to understand a change in Illinois' return to work law, and as a result, the college had to pay a penalty. Rather than addressing this easily correctable error by the single employee, the college instead terminated 84 of its faculty and staff. This termination had an undeniable disparate impact on the older workers of the college, and terminating 84 employees because of the mistake of a single employee is not a reasonable factor other than age. The district court used the wrong standard of review where it deferred to the college's actions on a deferential basis, instead of considering all the particular facts and circumstances as required by the Supreme Court in its decision in Meacham, and as defined in greater detail by the EEOC under 29 CFR 1625.7. In Meacham, and as described by the EEOC, a defendant must meet both the burden of production and the burden of persuasion to apply that defense. Instead, there were disputed issues of material fact that would have precluded summary judgment, and the district court erred when it granted summary judgment to the college. The EEOC really carefully laid out considerations for what should be used to analyze reasonable factor other than age in its regulations. Notably, those regulations were pending at the time of both Smith and Meacham, and those were actually looked at by the Supreme Court in those decisions, particularly in the opinions by Justice Scalia in both of those cases, talking about the reasonableness of those rules. Under E1 of those regulations, it requires that the existence of an RFOA be decided on the basis of all facts and circumstances surrounding each individual situation, and squarely puts the burden of proof on the employer. Looking at that section, the E1 section, you can see that there exists in the record disputed issues of fact that should have precluded summary judgment. Most notably, the district court relied on the notion that it was burdensome to monitor annuitants. However, the facts in the record show that for the first year under this new act, the FIS Act, the college utilized one of its HR employees, Craig Arndt, and he was able to easily and readily identify the earnings limitations for each of the annuitants. He was able to easily monitor the compliance under the law. It wasn't until 2013 that the college delegated the monitoring to a second employee, Ms. Lizalde, who didn't understand the FIS Act and basically ignored it altogether. You have a situation where the college wasn't monitoring its obligations under the return to work law. I would note that if you look at the return to work law itself, it specifically says that it's the obligation of the employer to determine whether an annuitant is an affected annuitant. That's under subsection C of 139.5. The college at this point can't establish that it was burdensome to monitor because it was never trying to monitor. Then there's a second problem with that, complying Ms. Lizalde's failure to monitor the earnings limitations at all. The way that the return to work law works is that during one year, an annuitant would become affected, and then the penalty only kicks in in the following year. But the college, in this case, never tried to determine whether or not people had become affected during one year and then not employ them during the next year. What difference does any of this make? The reasonable factor other than age affirmative defense is a very easy defense to establish. If there's a reasonable reason other than age, and here it's the administrative hassle of implementing these new rules, we don't test that for matters of degree or whether the employer was actually able to effectively, administratively implement this program. All the employer has to do is advance a reasonable factor, and if it has nothing to do with age, then the defense is established. I disagree with that. It's not like the Title VII defense. I understand, and I understand that there are cases that talk about that it's a relatively low burden, but it is still a burden. Right, and administrative, this program is clearly administratively, it requires some administrative effort to implement it. You've got to classify and sort your employees, you've got to monitor their earnings. I mean, there is some administrative burden associated with implementing the new rules for employing annuitants. Well, let me address that in two ways. First of all, it's disputed how much of a burden or whether there is any burden. How much of a burden doesn't really matter. It's clear and it's undisputed that there are new rules, and these rules require some administrative changes in order to implement them and correctly account to the state program for any employment of annuitants. And they come with really severe penalties. So the severity of the penalty is alone enough to establish that this is burdensome, at least to the minimal degree necessary to establish the affirmative defense. But the way that you're articulating that, that's really sort of a rational basis type of test. And we understand that the analysis... No, we're not just imagining rational basis. There is evidence in the record to establish what it takes to comply with the new rules. And that's all that's necessary. Well, but when we're looking at the burden under the RFOA defense, there's a couple things that talk about exactly what hurdle the employer has to meet, right? And so we know it has to be higher than a simple rational basis. I mean, one of the things the college is saying here is that it's just too difficult in the abstract to monitor, so we're not going to employ... No, it's not an abstraction. It's not anything close to the rational basis test. There's an evidentiary basis for this here. The rational basis test doesn't require an evidentiary showing. It requires only the reaches of imagination. Well, that's exactly the point that I'm raising, though. No, we have an evidentiary basis here. We don't just have argument. We have evidence. Well, and the evidence is disputed, right? The evidence... No, there's no dispute that there is some administrative effort required to account to the state for the annuitants that are employed and to keep track of their hours. There's no dispute about that. Right. The dispute is whether or not that is burdensome and whether it's reasonable to terminate all of the employees that might require some amount of monitoring. No, that's not the test. The test is whether there's a reasonable basis other than age. Right. But we know that the college already has to monitor all of these things for other reasons. So the issue is whether or not it's burdensome on the college to monitor for this purpose when it's already monitoring for all sorts of other purposes, including the Affordable Care Act, where it would have to monitor those things. And so the issue here is that the college wasn't doing that. It wasn't even meeting its basic obligations to monitor the earnings. Why does that matter? Well, again, because the college, at the end of the day, has the burden of proof at summary judgment to show both that it has a basis for it, which is what you're talking about, but it also has to persuade, it has the burden of persuasion that that is a reasonable outcome. And if we look at the factors that are cited in the regulations about how you evaluate that, it's clear that the college can't establish that or that at the very least there's disputed issues of fact. So if we look at the factors under the EEOC's regulations, under E2 where it lists a number of possibilities on what would be reasonable, and it talks about things about whether or not there was an assessment of the impact on older workers, whether or not there was steps to reduce the harms to other workers. And in this case, the college, first of all, they knew that the problem with the compliance was wholly a result of this employee failing to correctly understand that there were two laws that she had to monitor, not just one. They knew that there was a number of employees who could never be impacted by the return to work law at all because either their annuities were too high or too low. And so there was no assessment by the college at all. It simply threw up its hands and said, we can't do anything. Are the unaffected people still working there? People that, as you point out, were not affected? No. Was everybody across the board adjunct and part-time? And what's the third category? There was some staff that aren't included in the class, but, yeah, there were other people also. No. And these are people, and for example, the named plaintiff, Mr. Dayton, he could not possibly have taught enough classes to become an affected annuitant, but he was terminated regardless. Was he an adjunct? He was a part-time faculty. No, an adjunct faculty. Okay, because I was a little confused about various categories of what people do. And 84 lost their jobs? Or is it 84 people who are making this claim? It's 84 faculty and staff lost their jobs. I think the number of part-time and adjunct faculty was more like 60. Was what? It was 60. Those are the people that are represented by the plaintiff in this case. Okay. But it was an across-the-board policy, so even though there were people, as I said, who could never possibly be affected and the college knew they could never possibly be affected, they were swept into this as well. What is their status now, those who so-called lost their ability to participate as an adjunct or part-time or whatever? What's their status in relationship with the school now? They don't have a status with the school. Well, they're retired or something. That's true. So they would have the status of retirees, but they're not able to teach and they're not able to contribute to the college. And the penalty for this particular one, was it $25,000 each? No, it was based on the annuity. And so in this instance where she failed to monitor, I think the total penalty was something around $70,000, most of which was attributable to a single individual. A single person? Right. So I think there were two individuals with several thousand dollars each and one Mr. Sternowski where it was the bulk of the penalty. And so it really was the failure to correctly monitor in this case. Well, I'll ask them the same question, but that's a lot of faculty to lose. Did they hire new people that were not, I guess, vulnerable? I don't think that's in the record. But again, you are right. That's a lot of knowledge and that's a lot of really harm to the college that really wasn't thought out compared to what the potential risk was. Maybe I missed it. Did somebody point this out or make that argument of what was the detrimental effect on the college? I don't believe that was part of the analysis. But it is part of really what both Meacham and the EEOC's regulations are looking at and addressing about the RFOA defense is evaluating not whether there is a plausible reason that can be advanced by the employer, but some level of scrutiny of the employer's reasons and whether or not those reasons are advanced by the action. And so when we're looking at factors such as whether or not the policy is related to the business purpose, the extent to which they assess the policy and whether or not how that adversely affected the older workers, and these are all the factors under E2, it's clear that the district court didn't make this assessment. The district court said, basically, that they can state a reason. And in its decision, it specifically said that the plaintiffs were then going to be required to disprove the employer's proffered reasons. But where the record contained these factual disputes about the burden of monitoring, about the fact that the college was not actually monitoring or even attempting to check, then they can't meet that level of scrutiny. Let me talk real briefly about the claim under Illinois law because I don't want to run out of time, and that is something I wanted to address. And I think the point that I want to make under the Illinois Constitution is there is some protection for state retirement benefits under Article 11, Section 5. Under the well-recognized exception for retaliatory discharge that Illinois courts have applied, you can't force employees to choose between their jobs and a constitutional right, in this case, the retirement benefits. And that's exactly the sort of dilemma that the annuitants were being placed in. The retirement benefits are not at risk by this policy. No, but they're being retaliated against for accepting the retirement benefits. How so? Because had they not been receiving their annuities, they would still be employed by the college. And by accepting the annuities, there is a retaliatory... There's no causal link here. Well, the college specifically stated that the reason that these people were not going to be employed in the future is because they were receiving an annuity. But the only constitutional right, if there is such one, would be the annuity. That's true. I mean, this other job was an add-on, which was nice for some people and seemed to be a good benefit to the school and to the students. Maybe they are disappointed in coming back to school and find out that so-and-so is not teaching anymore or something like that. I don't know. I mean, this is a two-year college, right? Yes. Yeah. Well, and that's the analogy that I looked at. Empathy, did you say? Analogy that I looked at when we're looking at similar types of retaliation statutes under ERISA, where retaliation against people for having the annuity, receiving the benefit, would be treated as a basis for retaliation. So ultimately, we believe that there are plenty of disputed issues of fact that would have precluded summary judgment. I'm going to reserve the remainder of my time. Thank you, Mr. Eisenhart. Mr. Garrett. May it please the Court, my name is Frank Garrett and I represent the Appellees Oakton College and individually named college administrators. The regional factor other than the age test was correctly analyzed by the district court in granting summary judgment for the defendants. The college's decision to discontinue the employment of SURS annuitants based upon concerns regarding potentially significant financial penalties, as well as actual penalties that incurred, in addition to the expense and burden of monitoring the compensation and employment of such individuals so that they did not become affected, were reasonable factors other than age and thus did not violate the ADEA. I would say that this court has recently addressed the reasonable factor other than age defense in two similar cases involving determination of employment and reduction of benefits for older employees. Both cases are relevant here and supported by the district court's decision. In Carson versus Lake County, Indiana, there were a group of employees who were 65 years and older who were offered a retirement incentive entitling them to retire at 65 with five years of supplemental health insurance through Aetna. It also allowed them to return on a part-time basis to the county for employment. These rehired county employees that were on Medicare and on the supplemental insurance for five years were later terminated by the county due to a miscalculation by the county, admittedly by the county, of the insurance options that they could afford to these employees without violating federal law and the concern about increased insurance costs that they simply could not bear. In regard to the plaintiffs in that case, in regard to their disparate impact claim, the county proffered that it terminated these employees based upon the skyrocketing insurance costs, as I said earlier, as well as to comply with federal law. This court ruled that the county's desire to do so and to comply with federal law to monitor its costs were reasonable factors, other than age, that supported this decision to terminate this group of older workers without violating the ADA. I guess it's kind of undisputed there could have been a better way, maybe, in hindsight, than what they did. But I guess what your argument is that there may be a better way, but the way they chose is defensible, I guess. That is right, Your Honor. The reasonable factor other than age tests and analysis does not require that there be a better way or a more narrowly tailored way, different than maybe under Title VII. It simply requires that the way that the employer initiated it was based upon reasonable factors. So there's no need for a showing of, well, maybe there's a better way. I guess it's not in the record. With the 84 people who were terminated, who replaced them, if anyone? No, Your Honor, it's not in the record per se. It's just a curiosity that I have. It seems that that's quite a few people in classes that are no longer taught. And that would impact the students more than as much as anybody. I would say that the college certainly had a history of employing adjunct and part-time faculty that were annuitants for years and desired to do so until the return to work law came into effect, which really caused them great concern about the ability to do so without facing some severe financial penalties. Although there certainly are many annuitants, there are many part-time adjunct faculty at Oakton College that are in the age category at issue here. They simply are not SURS annuitants. Okay. Has that law been adjusted at all? Is there anybody attempting to try to change it? I heard that there was some movement toward doing that to make adjustments. I do not believe it has been done so. It certainly was proffered as a way for the state to revamp its pension system, and really that was the primary purpose. But before the law came into effect, Your Honor, and I believe the record does include this, monitoring of employment was simply at the expense of individual annuitants. Any penalty they incurred was their penalty. And Illinois has enough problems with pensions as it is. Yes. I agree. Yes. And so in looking at O'Brien, this court handed down a decision just last month in which, in that case, Caterpillar, in exchange for the elimination of its very expensive company-based unemployment system, offered retirement benefits to employees, but also not just benefits to those employees who are eligible to retire. It said to a group of employees, if you retire in your retirement age, you're going to get a prorated share of this fund. Even those folks who are not eligible to retire were going to receive a prorated share. The only group that would not receive a share of the fund distribution by Caterpillar were those folks who were of retirement age and chose not to retire. And those were the folks that brought suit in that case because they did not receive that distribution. This court analyzed the proffered defense by Caterpillar under the reasonable factor other than age analysis and said that simply reasonably designed employment show that its factors are reasonably designed to further or achieve a legitimate business purpose and administer it in a way that reasonably achieves that purpose in light of the facts that were known or should have been known. That's the test. Plaintiffs, I believe, are attempting to elevate that to something more than what it is. The court said in O'Brien, this is a relatively light burden. In that case, they upheld the Caterpillar action saying that it was justified by several non-age related factors. A desire to get rid of this very expensive plan, a desire to really incentivize retirement by certain workers, and a desire to achieve peace with the union. In that case, the people who chose not to retire, like me, I guess they're a benefit to the school, or I'm sorry, to the corporation. The folks that decided not to retire? Yeah. Yes, you certainly would argue that based upon what their knowledge, their experience certainly would be a benefit to the corporation. Well, benefit and also as far as money. Yes. I think that's why they filed the lawsuit. Sure, sure. Do you think the EEOC regulation that has been invoked here is consistent with the Supreme Court's decision in the Smith case interpreting the defense? I do not believe that the EEOC regulation that's being invoked here is consistent with that. It may be partially consistent, but there's that long laundry list and to the extent that that list can be read to suggest some form of narrow tailoring, which Smith ruled out. Right, and I think if you read the EEOC regulation with the understanding also that that regulation was really designed to understand that employers could invoke a reasonable factor other than age defense, but they were going to bear the burden of production and persuasion. Although those laundry lists that have been invoked here are there, they are considerations, they are suggestions. Even if you look at E3 underneath that laundry list, it states that none of those are required to be shown by an employer, whether in combination or singly. So I think in order for an employer to be able to still take advantage of the reasonable factor other than age defense. So I think they're considerations, but that's what they are. Nothing more. So for a plaintiff to argue that somehow those have to be looked at one by one, they have to be listed in a decision or there's an error, it's simply not what the law requires. The other concern that I have on that is I do believe plaintiffs are attempting to raise the actual burden, raise the burden on the employer in that sense, and it's not heightened scrutiny, it's not intermediate scrutiny, it's reasonable factors other than age, and that's all there is. So I would argue that those are inconsistent with SMEF. So in O'Brien, the employer also made clear that it does not require a showing, this court made clear, does not require a showing that the employer examine other ways to achieve its goal. The court said that. There's no requirement that there would be an other showing of, well, did you try this, did you try that? That's not what the reasonable factor other than age defense is. In similar fashion here, the district court looked at the college's reasons for not renewing SURS annuitants. The district court considered the penalties faced by the college and employees such annuitants, the actual penalties it faced, and the future penalties that it could face if it did not properly monitor that group of employees. Contrary to what plaintiffs have argued, it wasn't that simple. And the record shows that if you look at all the factors that the college had to bring together from different departments, 80 different deans to make sure that every adjunct was staying at the level that they needed to stay at. How many different deans did you say? Over 80 different deans at the college. Deans? Yes. Yes. To actually put this into place with their department chairs and division heads to ensure that that annuitant did not only receive a course in that area, but that they weren't also teaching in another area of the college. In addition to, these individuals could be teaching at another college for which their annuity could be affected. It was significant. The record does support that. It wasn't just speculation. It was to the point where the college looked at, if they were to continue to employ these annuitants, whether or not they would need to bring on additional employment of folks to be able to actually handle that. The court looked at the arguments that the plaintiff has raised. They didn't ignore them, and they didn't forget them. They did look at whether or not it mattered that there were some folks that may not ever meet the threshold because their annuity was so low or so high. The court said, but the only way the college was ever going to be truly sure was to, across the board, decide we're not going to hire those folks. I would also argue for those folks where it's argued that their annuity was less than $10,000, so therefore they're not affected by the statute. That does not prevent those folks from receiving increases, COLA increases, every year that would still require the college to maintain whether they did ever hit that $10,000 threshold. So it's not that easy. The court determined that the college's decision was based on reasonable factors and met the requirements of the statute. It rejected, and it probably did, the argument from the plaintiff that it could have done better or it could have done it in a more narrowly fashioned way. Again, that is not the requirement under the reasonable factor other than age defense. And the court said that no jury could find this to be unreasonable. You mentioned to teach at a different, unrelated school, college. Would that have an impact? It would, Your Honor, if many adjuncts did teach as they do at different institutions across the state. There may be some that teach a couple classes at one two-year college, they teach another one at another. All of that goes into an examination of whether or not they have met the 40% limitation. So you can't even go out of state. You can't get away from that. I'm not sure about out of state, Your Honor, but with regard to Illinois Community Colleges, which in the Collier County series are several. I don't mean even, I mean teaching at a private school for somebody else. I mean, not related to the government or public. It's not public. It's a private school, but still they could teach a similar or same course. It would still, whatever income they got would still put into the equation? Not if it's at a private school, Your Honor. Yeah, that's my question. It would only be those public institutions that are covered by the state university retirement system. Okay, I can understand that. All right. Mr. Garrett, if you teach at another community college within the state, whose responsibility is to monitor that? Is that reported to Oakton or by an individual? It is a difficult issue. It is required to be monitored by both colleges that they would be working for if they're in the SURS system. For example, and I don't believe this is in the record, but just to answer your question, a lot of colleges are requiring adjuncts to sign affidavits that they're only teaching here or they do not have any other teaching assignments so that they could better monitor their teaching. But again, it's up to that adjunct to be accurate and truthful as to whether or not they are, because if there is something, even in another SURS institution that brings them above that, the penalty is going to be faced by, I believe, Oakton, but that other institution as well. That's right. But it does not stop and has not stopped these SURS annuitants from teaching in other locations like private colleges or other places that they may choose to do so. And just to clarify, when you mentioned 80 deans just a moment ago, you're talking about the entire community college system, not Oakton, right? It's just Oakton. You have 80 deans at Oakton? Because they have 80 deans of various size. Yes, Your Honor. Whether they're associate deans, deans. Okay. Okay. But yes, I was just looking back, but it is 80. Yes. That's a top-heavy bureaucracy. Yes. I believe that some of the deans also carry a dual role of a teaching and a dean, so there may be some of that there. I would hope so. But it leads to the issue of difficulty in monitoring a number of folks because, again, it wasn't just the financial expense. Certainly that was a big factor the college looked at, but it also was just trying to get all this information from various deans, various departments, to HR in a timely manner to look at whether or not this person is becoming affected was difficult, if not impossible, according to Oakton. So in doing so, we have asserted, and I believe the court correctly examined the reasonable factors other than these that were proffered and determined that they were appropriate and met the test under the ADEA.  Your Honor, your honors correctly, I think, raised the question of there was no harm, there was no impairment of the right to a retirement benefit. That's not what Oakton did. In fact, and with regard to retaliation, these individuals have been working for Oakton for years, so there's no call what would be the cause of connection. They have been working for the college for years on their annuities. It was only as a result of this law that things changed, but notwithstanding, there was no proof presented that their constitutional right to a pension or a retirement from the state was impaired by the college's decision. They still have those. Thank you, Your Honor. Thank you, Mr. Garrett. Mr. Eisenberg. Thank you. Just briefly, I wanted to follow up on three quick points. The AD Dean question. The college is discussing the fact that there are AD Deans at the college, but what they failed to mention is that there's only one payroll system. We're monitoring earnings for the staff and faculty, and there's only one computerized system. The director of HR pointed out that you can look at the payroll system and know the earnings at any given time. So the discussion of the fact that there's AD Deans and there's all these departments and a top-heavy bureaucracy is beside the point that it's easy just to consult the computers and look to see what the earnings are. The facts show the college never did that. So a lot of the difficulties that they're raising are more hypothetical than real, and the record proves that they didn't actually check the record. Second, Judge Sykes, you had mentioned this discussion in Smith about the alternatives. Smith comes before the decision in Meacham, and Meacham specifically cites that portion of Smith. I think it's footnote 14 in Meacham, and talks about the correct scope of that quote at the end of Smith. And there's a couple paragraphs in Meacham that really question whether or not that is accurate, specifically because in Meacham they're talking about the burdens and who bears the ultimate burden of proof. So I think Meacham modifies that somewhat. Sasberg, does the record reflect the dual employment inquiry I made with Mr. Garrett? I'm not sure it does. The statute specifically addresses some of that. Yeah, I'm just looking at what the potential for the administrative burden is. And you speak of a single computerized program, but somebody's got to input that. So I'm just trying to see what kind of a web or network of employment feeds into that system. Are you talking about for other colleges? Yes. People who are working at Oakton and also at another college. Because the record in this case is very specific about what the HR knows and when they know it. So in terms of Oakton monitoring earnings within the college between all of these departments, that is very specifically addressed. That's within the Oakton community, but I'm speaking, I'm trying to please focus on members of that community, academic community, and also being a member of another academic community. Right. And that's the part that's specifically addressed in the statute itself. The statute itself says that the college may require its employees to prove where they're working and what the hours are. That's set forth in the statute itself. So I see my time has expired. Thank you very much. Thank you, Mr. Garrett. Mr. Eisenberg, the case is taken under advisement.